**ATTICUS LAW GROUP**
Jeffrey Scott Ranen (SBN 224285)
  JRanen@atticuslawgroup.com
Parisa Khademi (SBN 271897)
  PKhademi@atticuslawgroup.com
Mario A. Palencia (SBN 300315)
  MPalencia@atticuslawgroup.com
Margaret R. Wright (SBN 312272)
  MWright@atticuslawgroup.com
12121 Wilshire Boulevard, Suite 810
Los Angeles, CA 90025
Telephone: (213) 789-6549

Attorneys for Plaintiff GLEN BLOUGH

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLEN BLOUGH, an individual,<br><br>Plaintiff,<br><br>v.<br><br>XPO LOGISTICS FREIGHT, INC., and DOES 1 – 50, inclusive,<br><br>Defendant. | Case No.  2:24-cv-08148-MWF-JPR<br><br>[Assigned to the Hon. Michael W. Fitzgerald]<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>[*Filed concurrently with Separate Statement; Declarations of Margaret R. Wright and Glen Blough*]<br><br>**Date:   October 27, 2025**<br>**Time:  10:00 a.m.**<br>**Place:  Courtroom 5A**<br>**Judge: Michael W. Fitzgerald**<br><br><br>Action Filed: August 22, 2024<br>Trial Date:    February 24, 2026<br><br>District Judge: Michael W. Fitzgerald<br>Magistrate Judge: Jean P. Rosenbluth |

## <u>TABLE OF CONTENTS</u>

I.   <u>INTRODUCTION</u> …………………………………………………..5

II.  <u>STATEMENT OF RELEVANT FACTS</u> …………………………….6

   **A. Mr. Blough Is Subjected to Discriminatory Treatment**……………..6

   **B. After Defendant's Pump Malfunctions and Leaks a Small Amount of Fuel, Mr. Blough Attempts to Report It to Management.** ………….8

   **C. Orozco Immediately Recommends Termination Without Completing any Investigation.** …………………………………………..11

   **D. Defendant Suspends Mr. Blough Pending an Investigation, yet Takes No Steps to Verify the Failure to Report Accusation.** ……………...12

   **E. Defendant Fires Mr. Blough Based on the Unverified Failure to Report Accusation.** ……………………………….…………..13

III. <u>LEGAL ARGUMENT</u>

   **A. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Age Discrimination Claim.** …………………………………………..15

      i.   <u>There Are Multiple Genuine Disputes of Material Fact as to Plaintiff's *Prima Facie* Case of Discrimination.</u> ……………..16

      ii.  <u>Defendant's Contention about Its Decisionmakers' "Honest Belief" Is Heavily Disputed and Does Not Negate the Evidence to the Contrary.</u> ………………………………………………16

      iii. <u>There Is Significant Evidence of Pretext.</u> ……………………20

   **B. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Wrongful Termination Claim.** ……………………………………22

   **C. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Punitive Damages Claim.** …………………………………………22

      i.   <u>There Is a Genuine Dispute of Material Fact as to Whether Each of the Decisionmakers Was a Director, Officer, or Managing</u>

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

Agent. ……………………………………………………22

ii.  A Jury Could Determine that Defendant Committed Fraud. ..26

IV.  **CONCLUSION** …………………………………………………..28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Statutes**

Cal. Civ. Code § 3294. ............................................................................... 23

**Cases**

*Azzaro v. County of Allegheny,* 110 F.3d 968 (3d Cir. 1997) .................................. 20
*Cruz v. Homebase,* 83 Cal. App. 4th 160 (2000) ...................................................... 23
*Davis v. Hearst* 160 Cal. 143 (1911) ......................................................................... 23
*Davis v. Kiewit Pacific Co.,* 220 Cal. App. 4th 358 (2013) ...................................... 24
*Deaconess Med. Center-West Camp.,* 160 F.3d 484 (8th Cir. 1998) ....................... 22
*DeLesstine v. Ft. Wayne State Hosp. & Training Ctr.,* 682 F.2d 130 (7th Cir. 1982) ........................................................................................................................... 22
*Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809 (1979). ...................................... 23
*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968) ............. 16
*Gagnon v. Continental Casualty Co.,* 211 Cal. App. 3d 1598 (1989) ...................... 23
*Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317 (2000). ..................................................... 16
*Kohler v. Inter-Tel Techs.,* 244 F.3d 1167 (9th Cir. 2001). ...................................... 16
*Logan v. Denny's, Inc.,* 259 F.3d 558 (6th Cir. 2001) .............................................. 22
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............... 16
*McDonnell Douglas v. Green,* 411 U.S. 792, 801-04 (1973). ................................... 16
*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz. Cos., Inc.,* 210 F.3d 1099 (9th Cir. 2000). .................................................................................................................... 16
*Powerhouse Motorsports Grp., Inc. v. Yamaha Motor Corp., U.S.A.,* 221 Cal. App. 4th 867 (2013) ..................................................................................................... 24
*Reeves v. Sanderson Plumbing Prod. Inc.,* 530 U.S. 133, 147 (2000) .................... 19
*Stewart v. Rutgers, State Univ.,* 120 F.3d 426 (3d Cir. 1997) .................................. 20
*Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981) .................................. 17
*Village of Arlington Heights v. Met. Hous. Dev. Corp.,* 429 U.S. 252 (1977) ......... 19
*White v. Ultramar, Inc.,* 21 Cal.4th 563 (1999) ....................................................... 23

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

## I.    **INTRODUCTION**

Plaintiff Glen Blough, a 57-year-old driver, worked for Defendant for over 34 years when he was abruptly fired for an offense—failure to report a spilled puddle of fuel—that did not violate any policy and for which Defendant had never fired an employee ever before. The punishment did not fit the crime, Defendant failed to investigate the circumstances behind the spill, and did not follow its own policies or past practices when jumping to the conclusion that Mr. Blough needed to be fired.

Defendant's Motion for Summary Judgment, supported by 75 so-called uncontroverted facts, must be denied because the following categories of material facts are disputed:

1) Facts 40, 42, 43, 44, 47, 49, 50, 51: The lynchpin of the termination decision is not the fuel spill itself, but rather Defendant's contention that Mr. Blough failed to report it. But it is heavily disputed that the investigation concluded Plaintiff failed to report the spill.

2) Facts 50, 51: Defendant has no policy specifically requiring employees to immediately report a fuel spill, nor did it train its drivers to do the same. Indeed, multiple employees and supervisors admitted that many spills, including those 10 gallons or less, do not need to be reported, and fuel spills regularly went unreported.

3) Fact 39:  Defendant has no credible evidence that the fuel spill was as large as 20 to 40 gallons. Rather, Plaintiff contends it was a much smaller spill and testimony of several key defense witnesses supports this fact.

4) Facts 43, 44, 47: It is undisputed that, had Defendant determined that Mr. Blough attempted to report the spill, he would not have been fired. It is also undisputed that Defendant did not investigate whether Mr. Blough attempted to report the spill. Mr. Blough testified that he did.

5) Facts 7, 43, 47, 48, 50, 51: It is vehemently disputed that the subject fuel spill constituted an "Accident" which would have provided a basis, but not

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

a requirement, that Defendant deviate from its progressive discipline policy and fire Mr. Blough without prior warning.

6) Fact 58: There is significant evidence to indicate that the termination decision was discriminatory. In addition to comments about his age, Mr. Blough testified that Defendant had a practice of preferring drivers and management under the age of 40; Defendant pressured older employees to participate in "voluntary layoffs" designed to eliminate them from the workforce; and Defendant engaged in specific examples of disparate treating of 40+ year old employees, including Mr. Blough.

7) Facts 54, 55: Defendant's conclusory assertions that none of the decisionmakers were officers, directors, or managing agents are disputed. In making the unprecedented decision to fire Mr. Blough, in violation of Defendant's own policies and practices, the decisionmakers were participating in an "ad hoc formulation of policy" sufficient to classify them as managing agents under California law. Witness testimony also indicates that decisionmakers concealed and/or intentionally misrepresented material facts in order to move forward with the termination.

The material facts in this case are probative of discrimination, indicative of pretext, and dispute the legitimacy of Defendant's termination rationale. Based on these facts, a reasonable jury could determine that Defendant's purported termination rationale lacks credibility, Mr. Blough was discriminated against, and Defendant is liable for punitive damages. Defendant has failed to meet its significant burden of establishing that there is no genuine dispute of material fact as to each of Mr. Blough's claims, and the Motion must be denied in its entirety.

## II.    STATEMENT OF RELEVANT FACTS

### A. Mr. Blough Is Subjected to Discriminatory Treatment.

Plaintiff Glen Blough worked for Defendant as a driver for 34 years. (Plaintiff's Separate Statement of Uncontroverted Facts and Supporting Evidence ["UNF"] 1.)

During his employment, he was referred to as "old man" and faced questions about when he was going to retire. (UNF 2.) About 80-90% of Defendant's drivers at Mr. Blough's location were under 40, and the vast majority of office staff were also under 40. (UNF 3.) Moreover, towards the end of Mr. Blough's employment, all of the newer supervisors Defendant hired, other than Ariel Orozco, were under 40. (UNF 4.) Most, if not all of them were in their mid- to late-20s. (UNF 4.) Mr. Blough contends that Defendant seemed to have a mentality and/or hiring practice where they preferred younger employees over 40+ year old employees. (UNF 5.)

In the last six to eight years of Mr. Blough's employment, "[a] lot of the managers" gave him the impression that they were "annoyed" with him. (UNF 6.) When they saw him at work, they would make faces or turn away and walk in the other direction. (UNF 7.) Managers did not treat younger drivers in a similar manner. (UNF 8.) Further, Defendant's management would show favoritism to younger employees: for example, they rarely selected 40+ year old employees for "Driver of the Month"; this decision had nothing to do with performance or tenure, and employees under 40 would be consistently chosen. (UNF 9.) Mr. Blough was never chosen for this honor, despite his 34-year tenure and good performance record. (UNF 10.) Likewise, Defendant would hold parties and celebrations for younger drivers when they met certain milestones, such as working for the company for five years; for drivers over 40, many of whom had more than 20 or 30 years with the company, Defendant did do the same. (UNF 11.) When Mr. Blough reached his 30 years with Defendant, he was not recognized with any sort of party or celebration. (UNF 12.) Other older drivers similarly faced different treatment, including being forced to transfer locations and "start at the bottom," effectively losing their superior pay and privileges. (UNF 13.) On at least one occasion, Defendant announced layoffs, and began asking the oldest and most senior employees, including Mr. Blough, if they would take time off work without pay—what Defendant referred to as "voluntary layoffs". (UNF 14.) This was done to try to eliminate older, more senior employees,

while keeping younger, less expensive employees; if the older employees did not volunteer, Defendant would have to start "cutting from the bottom." (UNF 15.) As a result of these efforts, several 40+ year old employees were separated from the company. (UNF 16.)

## B. After Defendant's Pump Malfunctions and Leaks a Small Amount of Fuel, Mr. Blough Attempts to Report It to Management.

On May 16, 2024 at approximately 3:45 a.m., Mr. Blough arrived at Defendant's facility after a night shift and parked his company vehicle at Defendant's portable fuel tank. (UNF 17.) Because the pump was "really slow" and would take a long time to fuel vehicles, he inserted the nozzle and walked to the restroom in Defendant's nearby maintenance shop. (UNF 18.)[1] At some point during the restroom break, which lasted no more than approximately five minutes, the fuel pump dislodged and fell out of the vehicle. (UNF 20.) Its emergency stop mechanism malfunctioned, and the pump began to slowly leak fuel onto the ground. (UNF 21.)

While Mr. Blough was in the restroom, a driver named Fernando Espino passed the fuel station while arriving to work at 3:50 or 3:55 a.m. (UNF 22.) He noticed a pump on the ground leaking fuel next to a parked vehicle. (UNF 23.) He picked the nozzle up, turned it off, and placed it on top of the vehicle. (UNF 24.) Espino did not attempt to clean any leaked fuel or report it to anyone. (UNF 25.)[2] He left the scene, walking into the office to clock in. (UNF 27.) He then walked to the dock to start work without mentioning the spill to anyone. (UNF 27.) When Mr. Blough returned from his restroom break, he noticed the fuel nozzle on top of his vehicle. (UNF 28.) At that moment, he realized it had likely fallen out while he was in the restroom. (UNF 29.)

---

[1] While it is undisputed that Mr. Blough briefly walked away from the vehicle, it is undisputed that this alone would amount to an offense that would result in termination, or even counseling or discipline. (UNF 19.)

[2] Espino—who also testified that he "personally would think" Defendant's drivers should report fuel spills to a manager or supervisor if the spill is too large to be cleaned up by the driver—testified that he has not seen any such fuel spills during his employment with Defendant. (UNF 26.)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

He then noticed a puddle of about one to two gallons of fuel on the ground. (UNF 30.)

At the time, Defendant had no policy dictating what to do in the event of a fuel spill. (UNF 31.) Mr. Blough and other drivers never received any training on the subject. (UNF 32.) Defendant's management never told drivers any specific actions they should take if fuel is spilled, other than to clean or contain it with a mop or other supplies. (UNF 33.)[3] Mr. Blough looked for these cleaning supplies, but could not find any around the fuel station. (UNF 35.) He then walked back to the maintenance shop to look for cleaning supplies, but could not find any there. (UNF 36.) He continued walking around the facility, looking for a manager or supervisor to report the leakage to, but did not see any on site—not in the shop, not in the office. (UNF 37.)[4] And, although Mr. Blough was aware of two office lines he could call, no supervisor was in the office to answer the phone. (UNF 39.) Nor did Mr. Blough have his supervisor's cell phone number. (UNF 40.)

Because he did not know what to do, he performed a Google search on his phone seeking guidance on how to address the puddle of spilled fuel. (UNF 41.) The search results instructed not to wash the spill or move it into any drains, and to let it dissipate on its own. (UNF 42.) As such, Mr. Blough believed that he had no reasonable choice but to follow these instructions. (UNF 43.) He then drove the vehicle away from the fuel station, either to Defendant's yard to park it, or to another location on Defendant's premises to fill the vehicle with diesel exhaust fuel. (UNF 44.)

In the minutes that followed, Freight Operations Supervisor Dakota Steele called Freight Operations Manager Ozzie Antuna to report that he had noticed "a

---

[3] There were no posters in the employee break room that advised what to do in the event of a fuel spill, nor were there any posters providing numbers to call in the event of an emergency. (UNF 34.)

[4] Similarly, when he went to the shop, there were no supervisors or managers present, only two mechanics who were not leadership and whose duties did not involve responding to fuel spills. (UNF 38.)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

puddle" that he believed "wasn't water." (UNF 45.)[5] Steele and Antuna approached the puddle and determined it was fuel. (UNF 47.) Under Defendant's policy, if Steele or Antuna had believed the puddle to be hazardous, they were required to report it to an emergency response team called ERTS. (UNF 48.) ERTS would then either clean the spill within three hours, or provide authorization and instructions for Defendant's employees to clean it. (UNF 49.) If the puddle was considered a "major spill," a third-party company called Patriot would be called in to clean it. (UNF 50.) But neither Antuna, Steele, nor any other managers reported the spill to ERTS or obtained permission from ERTS to clean the spill. (UNF 51.) Nor was Patriot called in to clean it. (UNF 52.) Instead, Steele, Antuna, and two or three dock workers located and brought cleaning supplies to the area, which were used to clean the puddle. (UNF 53.) Espino saw Antuna cleaning the puddle, yet did not report what he had witnessed, or otherwise talk to him about the spill. (UNF 54.)

Later that morning, Ariel Orozco, Defendant's Senior Service Center Manager, was stopped by Antuna while arriving to work between 6:00 and 8:00 a.m. (UNF 55.) Antuna told him there had been a fuel spill without providing any other details, including the size of the puddle. (UNF 56.) Orozco did not personally observe the spill. (UNF 57.) Nor did Abraham Tiscareno, Defendant's Assistant Service Center Manager, who arrived at some point between 6:00 and 9:00 a.m. (UNF 58.) Antuna later approached Espino to ask if he had seen the spill when he arrived at work. (UNF 59.) Espino admitted that he had, and told Antuna that he believed the spill was caused by a malfunctioning fuel nozzle. (UNF 60.) Antuna did not ask any other questions, including whether the spill had been reported—by himself, Mr. Blough, or anyone else. (UNF 61.) No witnesses looked into whether the spill was caused by a malfunctioning nozzle. (UNF 62.) Espino later provided a written statement, at Antuna's request, which did not provide any details as to the size or reporting of the

---

[5] When asked about the fuel spill, Steele originally testified, "I didn't know anything about this until the lawsuit was brought to my attention." (UNF 46.)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

spill, and which did not mention Mr. Blough by name. (UNF 63.) Other than this one conversation with Antuna, Espino did not speak with anyone else about the spill. (UNF 64.) Defendant later determined that the vehicle was Mr. Blough's. (UNF 65.)

### C. Orozco Immediately Recommends Termination Without Completing any Investigation.

After his conversation with Antuna on the morning of May 16, 2024, Orozco recommended that Mr. Blough be immediately fired on the same day. (UNF 66.) He made this recommendation to Luis Olmos, Defendant's Director of Human Resources, and Juan Melero, Defendant's Regional Vice President. (UNF 67.) Orozco represented to them that earlier that morning, Mr. Blough had caused "a big spill of fuel," driven off, and never returned. (UNF 68.) At that point, no one had interviewed Mr. Blough, nor had Orozco learned any details regarding the size or reporting of the spill. (UNF 69.)

After this termination discussion, Orozco did not reach out to each manager on duty, nor did he take steps to determine whether a manager was even on site at the time of the spill. (UNF 70.) But Orozco represented to Tiscareno that he had "basically validat[ed]" that Mr. Blough had failed to report the spill, and planned to proceed with the termination as an "unreported accident." (UNF 71.)

On May 17, 2024, Orozco emailed Melero and Olmos, attaching two photos, and stating:

> As discussed yesterday, Glenn [sic] Blough walked away from the fuel island while both pumps were still in his truck's tank, pumping fuel. The video shows him walking away, and the pictures clearly show a puddle of fuel on the ground. Given the severity of this incident and the fact that he drove away without reporting it, I recommend immediate termination. Anything else would set the wrong precedent and undermine our safety standards. (UNF 72.)

However, at deposition, Orozco admitted that he did not even know if the photos actually depicted the fuel spill. (UNF 73.)

11

At the time Orozco sent this email, he still had not interviewed Mr. Blough to ask what happened, why he had walked away, and/or whether he reported the spill. (UNF 74.) Human Resources Manager Rebecca Szasz testified that, if Mr. Blough had reported the spill even to non-managers, he would not have been suspended. (UNF 75.) But without taking steps to determine if he had, Orozco made the decision to suspend him. (UNF 76.) This decision was based on "video evidence [of Mr. Blough] leaving the fuel pump. (UNF 77.) However, when asked about video footage he reviewed at deposition, Orozco admitted that he could not see Mr. Blough, or the fuel spill, in the footage. (UNF 78.) No other video footage was reviewed as part of any investigation. (UNF 79.) Likewise, Orozco admitted that he did not review Espino's written statement at any point, did not make any decisions based on the statement, and did not even know if the statement referred to Mr. Blough's fuel spill or another incident. (UNF 80.)

### D. Defendant Suspends Mr. Blough Pending an Investigation, yet Takes No Steps to Verify the Failure to Report Accusation.

When Mr. Blough arrived to work the following Monday, May 20, 2024, he was pulled into a meeting with Orozco, Tiscareno, and Szasz. (UNF 81.) During this "very short" meeting, he was informed he was being suspended due to a fuel spill, and told to return his employee badge and keys. (UNF 82.) No one asked Mr. Blough if he walked or drove away (and why), or whether he had tried to clean or report the spill to anyone, including non-managers. (UNF 83.) He attempted to explain that he had tried to report the spill to a manager or supervisor, but could not find one on site. (UNF 84.) He also reminded these witnesses that fuel spills occur often but drivers simply clean them rather than reporting them. (UNF 85.) However, Orozco, Tiscareno, and Szasz did not ask him any follow up questions. (UNF 86.) Indeed, the *only question they asked* during this meeting was if he wanted to review video surveillance. (UNF 87.) When Mr. Blough declined, Szasz speculated that he "didn't care" because "he was retiring anyways," although Mr. Blough did not mention his

retirement during this meeting and was not planning to retire anytime soon. (UNF 88.)

Thereafter, Szasz and Orozco relayed to Olmos what was discussed at the May 20 meeting. (UNF 89.) Neither Orozco nor Szasz relayed to Olmos that Mr. Blough stated that he had tried to report the spill but could not find any manager on site. (UNF 90.) It is undisputed that, if Defendant determined Mr. Blough had attempted to report the spill, he would have not been fired. (UNF 91.)

After the May 20 meeting, no one asked Mr. Blough any other questions about the fuel spill. (UNF 92.) Defendant did not take steps to verify his statements that there were no managers on duty to report to, or that fuel spills frequently go unreported. (UNF 93.) Although Szasz admitted it was important to determine if Mr. Blough knew he was supposed to report the spill before firing him, Defendant did not do that. (UNF 94.) After the May 20 meeting, Defendant did not take any other steps to investigate the failure to report accusation. (UNF 95.) Szasz admitted that to this day, she does not know what happened, other than what she "saw on the video," Espino's witness statement, and her one-question "interview" with Mr. Blough. (UNF 96.)

Nevertheless, Orozco, Szasz, Olmos, and Melero moved forward with the termination. (UNF 97.) Orozco made the final termination decision. (UNF 98.) At the time, Defendant had a progressive discipline policy whereby employees are issued written warnings in progressive steps before being terminated. (UNF 99.) Under that policy, Mr. Blough would have, at most, received a written warning under these circumstances, given his clean disciplinary record. (UNF 100.) However, the decisionmakers did not even consider the possibility of issuing a written warning to Mr. Blough instead of firing him, despite his 34-year tenure. (UNF 101.)

### E. Defendant Fires Mr. Blough Based on the Unverified Failure to Report Accusation.

On May 22, 2024, Orozco and Szasz informed Mr. Blough that he was fired. (UNF 102.) At the time, he was 57 years old. (UNF 103.) Within days of the

termination, Defendant began training employees on how to respond to fuel spills. (UNF 104.)

It is undisputed that, at the time of the termination, the decisionmakers were aware that Mr. Blough was over 40 years old. (UNF 105.) Although Szasz testified that it is "important" to ensure that any employee termination is not discriminatory, she did not take any steps to do so. (UNF 106.)

Defendant's termination of Plaintiff was unprecedented. (UNF 107.) Numerous drivers, many of whom were younger than 40, have regularly caused fuel spills without reporting them to management. (UNF 108.) However, it is undisputed that Defendant has never terminated, or even disciplined, any other employee for failing to report a fuel spill. (UNF 109.) Indeed, even one of Defendant's own witnesses testified that Mr. Blough should not have been fired. (UNF 110.) It is also unclear what policy, if any, Mr. Blough violated. (UNF 111.) Defendant did not have any policy specifically requiring fuel spills to be reported to management, as confirmed by multiple decisionmakers. (UNF 112.) Multiple supervisors and employees, including Orozco himself, testified that not all fuel spills need to be reported—including spills of 10 gallons or less. (UNF 113.)

Szasz claimed that Defendant's policy relating to failure to an "accident" required Defendant to immediately fire Mr. Blough. (UNF 114.) However, she later admitted—and it is undisputed that—this policy does not require termination; it merely states that failure to report an "accident" *may* result in some sort of corrective action. (UNF 115.)[6] Moreover, the failure to report an "accident" policy indicates that it only applies to vehicular accidents and related damage. (UNF 117.) The definition of "accident" in Defendant's employee handbook, and the testimony of multiple

---

[6] Szasz later classified the spill as a "hazardous spill," rather than an "accident." However, multiple witnesses testified that diesel fuel is not considered a hazardous material. And Szasz admitted that there is no documented policy setting forth that a certain amount of fuel is considered hazardous, or any other policy that would otherwise indicate the same. (UNF 116.)

14

defense witnesses, confirms that this policy does not apply to fuel spills. (UNF 118.)

Mr. Blough contends that he was fired due to his age. (UNF 119.) His age and seniority resulted in a benefits package much more expensive than what Defendant had to pay for employees under 40, including more employer contributions to his 401(k) and more paid time off. (UNF 120.) He contends that Defendant fired him as part of an effort to reduce the number of older, more senior and more expensive drivers, to make way for younger drivers who were significantly less costly to Defendant. (UNF 121.)

## III.  <u>LEGAL ARGUMENT</u>

As the moving party without the burden of persuasion at trial, Defendant has "both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz. Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, Defendant "must either produce evidence negating an essential element of [Mr. Blough's] claim or show that [Mr. Blough] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* To carry its burden of persuasion, Defendant must *also* "persuade the court that there is *no genuine issue of material fact.*" *Id.* (emphasis added).

Plaintiff, on the other hand, must only establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). Importantly, Plaintiff need not establish any material issue of fact conclusively in his favor; he meets his burden if he can simply show that a factual dispute requires a jury to "resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz.*, *supra,* 391 U.S. at 288-89. All reasonable inferences must be drawn in Mr. Blough's favor. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

/ / /

## A. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Age Discrimination Claim.

### i. There Are Multiple Genuine Disputes of Material Fact as to Plaintiff's *Prima Facie* Case of Discrimination.

When interpreting FEHA claims, courts generally look to federal case law interpreting claims under Title VII of the Civil Rights Act of 1964. *Kohler v. Inter-Tel Techs.,* 244 F.3d 1167, 1172 (9th Cir. 2001). California has adopted the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 801-04 (1973). *See Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354 (2000). "At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination." *Id.* at 317. This initial trial burden requires Plaintiff to establish a *prima facie* case of discrimination: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or circumstances surrounding the adverse employment action give rise to the inference of discrimination. *McDonnell Douglas*, *supra,* 411 U.S. at 802. This burden "is not onerous"; Plaintiff need only show "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a prohibited discriminatory criterion." *Id.* at 355 (internal quotations and citations omitted). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Of note, Plaintiff's *prima facie* burden at trial is not the same as his burden in opposing a motion for summary judgment. Here, Mr. Blough need only establish that a genuine issue *as to any material fact* does exist. *Matsushita, supra,* 475 U.S. at 585-87; *First Nat'l Bank of Ariz., supra,* 391 U.S. at 288-89.

It is undisputed that Mr. Blough (1) was fired; and (2) was over 40 at the time

of his termination. It is also undisputed that he was qualified for the position of driver—a position he held for over 30 years. Defendant erroneously claims that Mr. Blough must instead establish he was performing competently in his position, and makes a failed attempt to establish that he was not by falsely characterizing disputed facts. Defendant claims it is undisputed that "failing to report an accident or an injury was a terminable offense under XPO's policies." Defendant's Motion for Summary Judgment ("MSJ") at 12:9-10, 16-21. However, it is undisputed that, under Defendant's policy, a failure to report an "accident" *may* lead to some sort of corrective action. Whether Mr. Blough violated this policy is also disputed: the definition of "accident" in in Defendant's Employee Handbook, the policy itself, and the testimony of multiple defense witnesses all indicate that this policy applies only to vehicular accidents, not fuel spills. Defendant's contention that Mr. Blough was incompetent is further disputed by the fact that he had not received any discipline or counseling in the years prior to his termination, the spill was caused by Defendant's malfunctioning nozzle, and even Defendant's own witness testified that he should not have been fired. Other than the fuel spill, Defendant has not set forth any evidence that Mr. Blough was not performing competently. Moreover, there are genuine disputes as to the size of the spill, whether Mr. Blough was required to report it, whether he attempted to report it, and whether Defendant actually verified that the spill was unreported before firing him for failure to report. The evidence also supports that other, younger drivers routinely failed to report similar spills, with no consequences, including at least one other employee who witnessed the May 16 spill but did not report it until he was later approached by a supervisor. Therefore, even under Defendant's erroneously cited standard, there is a genuine dispute of material fact as to whether Mr. Blough was performing competently when he was fired.

The only remaining element is whether similarly situated individuals outside of Mr. Blough's protected class were treated more favorably, or circumstances surrounding the adverse employment action give rise to the inference

17

of discrimination. *McDonnell Douglas*, *supra,* 411 U.S. at 802. Defendant acknowledges that Mr. Blough contends the termination was due to his age—a disputed fact—yet falsely contends that the only basis for Mr. Blough's belief is that he was "jokingly asked [] when he was going to retire." MSJ at 12:18-21. The only other evidence Defendant offers in relation to this element is that Mr. Blough testified that there were other drivers similar in age to him at the worksite. *Id.* at 12:16-18.

However, there is significant evidence to support a genuine dispute on this element. First, other drivers outside of Mr. Blough's protected class did not report similar fuel spills, yet it is undisputed that they were not fired, *or even disciplined.* Likewise, (1) about 80-90% of Defendant's drivers at Mr. Blough's location were under 40, and the vast majority of the office staff were also under 40; (2) all of the new managers hired, except Orozco, were under 40, and most if not all of them were in their mid- to late- 20s; (3) leadership showed favoritism to employees under 40— including by giving them awards of "Employee of the Month" and celebrating their work anniversaries—while drivers over 40 were not given this award or celebrated when they met higher milestones; (4) this included, specifically, Mr. Blough, whom leadership did not celebrate when he reached his 30 year anniversary with Defendant; (5) Mr. Blough contends that Defendant seemed to have a mentality and/or hiring practice where it preferred younger employees over 40+ year old employees; (6) in the last six to eight years of Mr. Blough's employment, several managers gave him the impression that they were "annoyed" with him by making faces and walking away when they saw him, while they did not treat employees under 40 in a similar manner; (7) Mr. Blough was regularly subjected to comments about age and retirement by other employees; (8) Defendant pressured Mr. Blough and other older employees to participate in "voluntary" layoffs so it could retain younger, cheaper employees; and (9) as a result of these efforts, several 40+ year old employees were separated from the company, many of whom Mr. Blough can identify by name and/or position.

In addition, there is significant evidence supporting that: Mr. Blough was not

required to report the fuel spill; even if he were, Defendant immediately sought to fire

him based only on an unverified, uninvestigated accusation; Orozco mischaracterized

the photos and video footage to other decisionmakers in an attempt to justify the

termination; and the termination violated Defendants' own policies. *See, e.g., Reeves*

*v. Sanderson Plumbing Prod. Inc.,* 530 U.S. 133, 147 (2000) ("Proof that the

defendant's explanation is unworthy of credence is simply one form of circumstantial

evidence that *is probative of intentional discrimination*, and may be *quite persuasive*

. . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity

of the explanation that the employer is dissembling to cover up a discriminatory

purpose") (emphasis added); *see also Village of Arlington Heights v. Met. Hous. Dev.*

*Corp.,* 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence

also might afford evidence that improper purposes are playing a role"); *Azzaro v.*

*County of Allegheny,* 110 F.3d 968, 974-75 (3d Cir. 1997) (failure to follow policies

applicable to employee suggests that discrimination may be involved); *Stewart v.*

*Rutgers, State Univ.,* 120 F.3d 426 (3d Cir. 1997) ("arbitrary and capricious" decision-

making, coupled with "procedural errors," constitutes circumstantial evidence of

discrimination). This evidence raises genuine disputes of material fact as to the

circumstances surrounding Mr. Blough's termination.

        ii.   <u>Defendant's Contention about Its Decisionmakers' "Honest</u>
            <u>Belief" Is Heavily Disputed and Does Not Negate the Evidence</u>
            <u>to the Contrary.</u>

In a failed attempt to meet its summary judgment burden, Defendant cites a

heavily disputed contention—and nothing else—that its decisionmakers "honestly

believed" Mr. Blough's failure to report the spill was a terminable offense. MSJ at

13:14-16. However, significant documentary and testimonial evidence indicates that:

(1) Orozco, the final decisionmaker, sought to immediately fire Mr. Blough before

verifying any details about the spill or reporting of the same; (2) Orozco admitted that

drivers did not need to report smaller fuel spills, yet never took steps to determine the

size of the spill before firing Mr. Blough for failing to report it; (3) multiple decisionmakers confirmed that there was no policy specifically requiring Mr. Blough to report the fuel spill; (4) other employees, many of whom were younger than Mr. Blough, caused fuel spills yet regularly failed to report them; (5) no other employees were terminated *or even disciplined* for their failure to report similar fuel spills; (6) the decisionmakers failed to ensure the termination was fair and consistent, especially after learning from Mr. Blough that other drivers did not report fuel spills; (7) the decisionmakers failed to verify whether Mr. Blough had, in fact, reported the spill before firing him; (8) the photos and video footage used to justify the termination do not clearly depict Mr. Blough, the fuel spill, or any purported failure to report; (9) Orozco mischaracterized the photos and video footage in an attempt to justify the termination; (10) the policy used to justify the termination does not apply to fuel spills, nor does it require immediate termination; (11) it is undisputed that Mr. Blough should not have been suspended or fired if Defendant determined that he attempted to report the fuel spill; (12) Defendant did not make efforts to verify whether Mr. Blough did attempt to report the fuel spill; and (13) Mr. Blough did attempt to report the fuel spill, and notified the decisionmakers of the same, yet was still fired.

Therefore, a reasonable jury could conclude that Defendant had no legitimate, non-discriminatory reason for the termination.

### iii.  There Is Significant Evidence of Pretext.

Defendant asserts that it employed 57 drivers aged 40+ at the time of Mr. Blough's termination, several of which have since been separated. MSJ at 14:22-24; Szasz Decl. at para. 15. Defendant does give context to this number by citing the total number of drivers it employed. *See id.* The only other undisputed fact Defendant cites is that three of the decisionmakers were over 40. MSJ at 15:13-15. While these facts may lead a jury to determine no discrimination occurred, they do not establish that no genuine issue of material facts exists with respect to the pretextual nature of the termination. And, in fact, there is evidence showing that 80-90% of Defendant's

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

drives were under 40, the vast majority of Defendant's office staff were under 40, and all of the new managers Defendant hired (other than Orozco) significantly younger than 40.

Likewise, Defendant's contention that "all of XPO's witnesses testified consistently with each other and consistently with XPO's stated termination reason" is false and heavily disputed, and the cited comments about Mr. Blough's age are just one small example of the numerous sources of "specific and substantial" evidence supporting a finding of pretext.

Primarily, the evidence that Defendant's reason for firing Plaintiff was false and violated its own policies is "probative of intentional discrimination" and indicative of pretext. *Reeves, supra,* 530 U.S. at 147; *see also, e.g., Village of Arlington Heights, supra,* 429 U.S. at 267; *Azzaro, supra,* 110 F.3d at 974-75; *Stewart, supra,* 120 F.3d at 426. As is the fact that Mr. Blough was never previously trained, counseled, or disciplined relating to any fuel spill or failure to report the same. *See, e.g., Logan v. Denny's, Inc.,* 259 F.3d 558 (6th Cir. 2001) (no evidence that plaintiff was counseled about alleged problem). Even if Defendant could somehow offer a "plausible explanation" as to why Mr. Blough was fired, while other employees were *not even disciplined* for the same conduct, that is a matter "to be decided at trial and not by summary judgment." *Deaconess Med. Center-West Camp.,* 160 F.3d 484, 489 (8th Cir. 1998). Likewise, Orozco's decision to fire Mr. Blough based on the "investigation"—in which Mr. Blough was never asked any details, other managers and dispatchers were not asked if the spill was reported to them, and Orozco did not review Espino's witness statement or any video footage showing Mr. Blough or the fuel spill—is further evidence of pretext. *See, e.g., DeLesstine v. Ft. Wayne State Hosp. & Training Ctr.,* 682 F.2d 130, 136 (7th Cir. 1982) (retaliation shown through employer's "utter disregard of information at their disposal relevant to [plaintiff's] conduct").

The significant evidence outlined above establishes numerous genuine disputes

of material fact as to Mr. Blough's *prima facie* case of discrimination, Defendant's lack of any legitimate, nondiscriminatory reason for the termination, and the highly pretextual nature of the termination. As such, Defendant is not entitled to summary judgment on Mr. Blough's age discrimination claim.

## B. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Wrongful Termination Claim.

Defendant's only argument as to Mr. Blough's wrongful termination claim is that it "fails as a matter of law because his age discrimination claim fails as a matter of law." MSJ at 16:21-24. However, as outlined above, there are genuine disputes of material fact as to each of the material elements of Mr. Blough's age discrimination claim, and Defendant fails to establish that it is entitled to summary judgment on that claim. As such, Defendant has failed to meet its summary judgment burden as to Mr. Blough's wrongful termination claim.

## C. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Punitive Damages Claim.

Under California law, punitive damages are available where the plaintiff proves by clear and convincing evidence that the defendant acted with "oppression, fraud, or malice." Cal. Civ. Code § 3294(a). "The decision to award punitive damages is exclusively the function of the trier of fact." *Gagnon v. Continental Casualty Co.* 211 Cal. App. 3d 1598, 1602 (1989); *see also Egan v. Mutual of Omaha Ins. Co.*. 24 Cal.3d 809, 821 (1979) (determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury) (citing *Davis v. Hearst* 160 Cal. 143, 173 (1911) (such determinations are "wholly within the control of the jury")).

> i. There Is a Genuine Dispute of Material Fact as to Whether Each of the Decisionmakers Was a Director, Officer, or Managing Agent.

"A 'managing agent' is an employee with authority to establish corporate policy," including "rules intended to be followed consistently over time in corporate

operations." *Cruz v. Homebase,* 83 Cal. App. 4th 160, 163, 167-68 (2000) (internal quotation marks omitted). Such corporate policy "does not require a showing of a formal adoption of the policy by resolution or formal direction by a managing official, but may be established as a de facto policy upon a showing of uniform course of conduct by lower level employees." *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 834-35 (1979).

"The scope of a corporate employee's discretion and authority under our test is therefore a question of fact for decision on a case-by-case basis." *White v. Ultramar, Inc*., 21 Cal.4th 563, 566-67 (1999); *see also Egan, supra,* 24 Cal.3d at 822-23 (holding that whether employee acted in a managerial capacity depends on the discretion the employees possess in making decisions that will ultimately determine corporate policy). "[T]he determination of whether certain employees are managing agents "does not necessarily hinge on their 'level' in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions.'" *Powerhouse Motorsports Grp., Inc. v. Yamaha Motor Corp., U.S.A.,* 221 Cal. App. 4th 867, 886 (2013). "[E]vidence showing an employee's hierarchy and job duties, responsibilities, and authority may be sufficient, absent conclusive proof to the contrary, to support a reasonable inference by a trier of fact that the employee is a managing agent of a corporation." *Davis v. Kiewit Pacific Co.,* 220 Cal. App. 4th 358, 370 (2013).

In *White,* a local supervisor terminated an employee for testifying on behalf of a former employee at an unemployment hearing. 21 Cal.4th at 567. She "was not a high-level manager or final policy maker" for the defendant, "a large corporation that operates a chain of stores and gasoline service stations throughout California." *Id.* at 580. In fact, "she apparently lacked the authority to terminate plaintiff without the approval of [the defendant's] human resources manager and division manager. Nor did she purport to set any firm-wide or official policy concerning termination of employees for testifying at employment hearings." *Id.* She did, however, exercise

authority that "necessarily result[ed] in the ad hoc formulation of policy" that adversely affected the plaintiff. *Id.* at 571; *see also Egan*, *supra*, 24 Cal.3d at 823. Specifically, she engaged in a local practice of retaliation by firing an employee who testified at the unemployment hearing of another employee. *White,* 21 Cal. 4th at 567. As such, the California Supreme Court held that she was a "managing agent" under section 3294, subdivision (b). *Ibid.*

Defendant makes the conclusory statement that Orozco "never exercised any discretionary authority over significant aspects of XPO's nationwide business" and "did not have the authority to change XPO's policies as they relate to even the XPO Springs location." MSJ at 18:10-13. As to the remaining three decisionmakers—Szasz, Olmos, and Melero—Defendant simply states, "none of them are or were officers, directors, or managing agents for the purposes of California's punitive damages statute." *Id.* at 18:23-19:2. The only evidence Defendant submits in support of these conclusory contentions are statements in declarations from the four decisionmakers that they "never exercised any discretionary authority over significant aspects of XPO's nationwide business" and do or did not "have authority to change XPO's policies as they relate to XPO's Santa Fe Springs location." *See* Melero Decl. ¶ 3; Olmos Decl. ¶ 4; Orozco Decl. ¶ 4; Szasz Decl. ¶ 5.

However, these contentions are not "undisputed," as Defendant falsely asserts. Significant evidence indicates that each of these individuals created a "de facto" policy for Defendant by participating in the unprecedented decision to fire Mr. Blough, without prior warnings, for failing to report a fuel spill. It is undisputed that no other employees in any of Defendant's locations have been terminated, *or even disciplined*, for the same conduct, despite evidence that similar fuel spills regularly go unreported. Moreover, Szasz and Olmos admitted that they are not aware of any policy requiring fuel spills to be reported, and Orozco (among multiple other employees and managers) testified that smaller fuel spills do not need to be reported. Likewise, Olmos, Defendant's Human Resources Director for the entire California

Region, testified that if Mr. Blough had attempted to report the fuel spill, he would have only received a written warning, rather than a termination. There is evidence that Mr. Blough *did, in fact,* attempt to report the spill and even informed the decisionmakers of the same, yet he was still fired by all four decisionmakers. Evidence also shows that the policy used to justify the termination—relating to failure to report an "accident"—applies only to vehicular accidents and not fuel spills, and it is undisputed that neither this policy (nor any others) have ever been used to fire any other employee for failing to report a fuel spill.

This evidence presents a situation very similar to that in *White*. Each of these four decisionmakers exercised authority which necessarily resulted in the "ad hoc formulation of policy"—a new policy dictating that (1) if an employee is aware of a fuel spill, regardless of size, that employee is required to report it; and (2) if the employee fails to do so, he or she will be terminated without prior warning, regardless of the circumstances. Indeed, within days of the termination, Defendant began training employees on how to respond to fuel spills, which indicated that employees were being instructed about this new policy created by the decisionmakers.

Moreover, while the supervisor in *White* was a local supervisor who did not alone have the sole authority to terminate the plaintiff, the evidence here indicates that all of the decisionmakers had significantly more authority. For example, Melero—Defendant's Regional Vice President for the California Region—testified that he oversees 25 of Defendant's locations throughout California and Arizona, including Santa Fe Springs, and his responsibilities include ensuring all such locations follow Defendant's policies and procedures, as well as ensuring the financial results for the entire region, among other duties. (UNF 122.) He directly supervises Olmos (Director of Human Resources), and Orozco (former Service Center Manager for the Santa Fe Springs location). (UNF 123.) Olmos testified that he oversees Human Resources functions for the entire California region—including investigations, terminations, etc.—and directly supervises Szasz, Human Resources Manager, who does the same

for several of Defendant's locations throughout the state of California, including in Bakersfield, San Fernando, Ventura, and Santa Fe Springs. (UNF 124.) Orozco, the Service Center Manager who oversaw the entire Santa Fe Springs location, directly supervised all managerial employees at the location, including Abraham Tiscareno (Assistant Service Center Manager), who directly supervised Ozzie Antuna. (UNF 125.) He testified that his "role was to lead the operations completely from start to end," and that he had the ultimate decision-making authority for employee terminations, including Mr. Blough's. (UNF 126.)

At a minimum, all of the evidence above creates a genuine dispute of material fact as to whether each of the decisionmakers amounted to "managerial agents" for the purposes of section 3294(b).

## ii.  A Jury Could Determine that Defendant Committed Fraud.

"Fraud" is defined as "an intentional misrepresentation, deceit, or concealment of material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code section 3294(c)(3).

On May 16, 2024, Orozco represented to Melero and Olmos that Mr. Blough had caused "a big spill of fuel," driven off, and never returned. At the time, Orozco had not personally seen the spill, in person or in video footage, nor had he been told any details about the size of the spill.

In his email to Melero and Olmos the following day recommending immediate termination, he falsely characterized certain video footage as "show[ing] [Mr. Blough] walking away," and characterized two photos he sent to Olmos and Melero as "clearly show a puddle of fuel on the ground." However, when shown these photos at deposition, Orozco admitted that he did not even know if the photos actually depicted the fuel spill, and further admitted that he did not see the fuel spill or Mr. Blough in the only video footage he reviewed.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

At the time, Mr. Blough had still not been asked what happened, how big the spill was, if he had even walked or driven away, and/or whether he reported (or attempted to report) the spill. Nor had Orozco or any other decisionmakers spoken with all managers and dispatchers to determine if Mr. Blough had reported the spill to them.

Orozco also testified that he made the final termination decision—despite evidence indicating that neither he *nor any of the other decisionmakers* ever actually verified that Mr. Blough did not report the spill. Indeed, Szasz admitted that to this day, *she does not know what happened* other than what is contained in the video footage and Espino's statement, neither of which shows Mr. Blough, the fuel spill, or any indication that he did not report (or attempt to report) it. And again, Olmos' testimony indicates that it is Defendant's policy or practice not to terminate an employee who attempts to report a fuel spill. Mr. Blough testified that he did attempt to report it, and even informed Orozco and Szasz of the same, yet the evidence indicates that they did not relay this information to Olmos or Melero in any of their communications. This record supports an inference that Orozco and Szasz made knowing misrepresentations and/or concealed critical facts with the intent of ensuring Mr. Blough's termination. These facts align with the definition of "fraud" under § 3294(c)(3).

As to Olmos and Melero, California courts recognize the "cat's paw" theory, under which an employer may be held liable if a biased or dishonest subordinate's actions are a substantial factor in bringing about an adverse employment action, even if the decisionmaker lacked discriminatory or fraudulent intent. *See Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95, 113–114 (2004); *DeJung v. Superior Court*, 169 Cal. App. 4th 533, 551–52 (2008). Even if Olmos and Melero were not personally aware of Orozco's misrepresentations, punitive damages liability can still attach because their decisions were proximately caused by fraud perpetrated by subordinates. California courts have held that where a decisionmaker relies on

manipulated or falsified information, the employer cannot insulate itself from liability by claiming ignorance. *See id.* Moreover, under Civil Code § 3294(b), punitive damages may be imposed where an "officer, director, or managing agent" ratified or acted with conscious disregard of fraudulent conduct. Here, Olmos' and Melero's acceptance of Orozco's misrepresentations without investigation, despite the serious consequences of termination, supports a finding of ratification or conscious disregard.

Given the above, a reasonable jury could conclude that Orozco and/or Szasz acted with fraud, and that Olmos and Melero ratified or relied upon that fraud in terminating Mr. Blough. This suffices to create a triable issue of fact regarding punitive damages. *College Hosp. Inc. v. Superior Court,* 8 Cal.4th 704, 725 (1994) (punitive damages appropriate where conduct shows "conscious disregard" for plaintiff's rights)

## IV.  <u>CONCLUSION</u>

Given the above, genuine issues of material fact exist as to each of the claims at issue in this Motion, and Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety.

DATED: October 6, 2025                    Respectfully Submitted,
                                          **ATTICUS LAW GROUP**


                                          By: /s/ Jeffrey S. Ranen_____
                                          JEFFREY S. RANEN
                                          PARISA KHADEMI
                                          MARIO PALENCIA
                                          MARGARET R. WRIGHT
                                          Attorneys for Plaintiff GLEN BLOUGH

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT